23590. Is the Council present? Present, Your Honor. Mr. Mastro? Mr. Parker? Yes, present. Okay. Mr. Mastro, you may proceed. Thank you, Your Honor. Randy Mastro of Gibson, Dun & Crutcher for the Roman Catholic Diocese of Brooklyn. And if I may request, Your Honor, I'd like to, if possible, reserve one minute of my five minutes for rebuttal. We usually don't do that, but if we've got questions of you after hearing from Mr. Parker, we might be able to do that. Okay. That would be much appreciated, Your Honor. Your Honors, this case concerns an executive order recently issued by Governor Cuomo that expressly singles out houses of worship for particular restrictive capacity limits in geographic zones of a maximum of 10 people in red zones and 25 people in orange zones. And whether those restrictions, which the governor has admitted are, quote, most impactful on houses of worship, end quote, that are specific to houses of worship, violate the free exercise clause of the First Amendment. Now, Your Honors, the district court recognized, and it's really not disputed, that this constitutes an irreparable harm to the diocese and its churches in this as-applied challenge. The question in the lower court was whether there was any likelihood of success or substantial question going to the merits, and the district court, Your Honors, applied the wrong legal standard to make that determination. When you have such an express restriction on houses of worship, as is the case here in the diocese churches, strict scrutiny applies, and applying a strict scrutiny standard, these particular restrictions are not in any way narrowly tailored to meet the clear interest that the government has. Mr. Mastro, this is just low-yielding. So when you say express, do you mean that any reference to houses of worship, in addition to other types of businesses and so on, counts as an express reference to religion, or do you mean something else? In other words, it's not that houses of worship are being singled out, because as I understand it from the executive order, there are a number of other establishments that are not religious that are part of and subject to the order and to the limitations, you know, to significant limitations. Yes, and Your Honor, houses of worship are being singled out for distinctive, disparate treatment. There are treatments for certain types of private enterprises, secular enterprises, that are different than the express restrictions on houses of worship. And in many cases, what the governor considers to be an essential business, secular business, is being treated in a more liberal way in terms of capacity restrictions. Things like megastores that serve groceries or hardware. What about, excuse me, this is Judge Rakoff, what about things that seem more closely related, like concert halls, movie theaters, lecture halls? Aren't you actually being treated more favorably than those? Yes, Judge Rakoff, I'm glad you asked that, because the constitutional standards is not for the courts to have to decide whether one type of business is more like a house of worship than another. The constitutional standard is whether the houses of worship have been singled out for disparate treatment that treats them in some way worse than certain secular businesses or enterprises. And here, unquestionably, that is the case over a wide swath of secular enterprises. Is a house of worship more like a theater than a mega department store where hundreds of people can congregate today under the governor's executive order and congregate and stay for hours and hours and shop at a Target? It's not for the courts in that context. This is just low-yield. This is the idea, and this is not original, because you see it in some other opinions outside of our circuit, certainly, that the safety-related issues associated with these mega stores, say, are categorically different from the safety-related issues associated with houses of worship and theaters. I don't know about you this semester, but I think that when people go into these relatively large stores, they're not lingering during this pandemic. They are moving and getting what they need to do and moving out, and there's not a lot of talking. As I understand it, the problem with certain establishments, including houses of worship, is the people are in one place. There is essentially a lot of talking and singing that increases the chance of infection. Is that right or wrong? If that's right, what do we do about that distinction? I'm so glad you asked that, because the premise of it, based on the factual record developed in this case, which makes this case unique, because we had a multi-hour hearing and witnesses, and their testimony was credited. The premise is, therefore, not supported in any way by the factual record in this case. In fact, the district court found on an undisputed record, and the governor basically concedes on this appeal, that the diocese churches have been an exemplar of community leadership in operating safely for months with safety protocols, social distancing, mask wearing, no singing, the church is willing to agree to no singing during its services. It has taken the concrete steps to operate safely, and guess what? It has worked, because the undisputed record in this case is, there hasn't been a single outbreak or spread of COVID in any of the Catholic churches over those many months of its safety protocols implemented. I have to add this, Your Honor, maybe your household is different than mine. When my wife and daughter go to a Target, they could spend hours there, shopping, you know, while shopping, looking for household appliances, getting food. It's not, it's a false premise to suggest that going to mass, the most fundamental ritual in the Catholic faith, for 45 minutes or less, no singing anymore, have to wear a mask, socially distanced, six feet apart, and every other appeal, not even entering and exiting, doing that in a staged way, so people are socially distanced at all times. This is Judge Park. Could I ask you, I guess this goes back to Loey's original question, what specifically is the problem from your point of view with the executive order? Is it that houses of worship should be considered essential? Is it that just the very fact that they're in a separate category is problematic? Is it the numbers, the absolute cap, the capacity limitation? I'm just trying to understand what you, what specifically is the problem here? Yes, Judge Park, the problem starts with that houses of worship are singled out for disparate treatment, a particular restriction that is different than many secular businesses who are treated more liberally and allowed to have unlimited capacity or greater capacity. That's, you start from there. Once you start from there, strict scrutiny has to apply, and I think that's consistent with the central synagogue case in this circuit, and I think it's consistent with other cases around the country, that once you have a rule that expressly singles out houses of worship, you have to apply strict scrutiny. Then the question becomes, constitutionally, whether the rule as applied to houses of worship or as applied to these houses of worship, the diocese churches in and out as applied challenge, whether they're narrowly tailored to meet the government's compelling interest, and I respectfully submit that as to the diocese churches and perhaps as to other houses of worship, they're not narrowly tailored at all because the diocese has an unblemished record of success living under the 25% cap it imposed on itself, and it's the alternative cap under Governor Cuomo's executive order, and it will continue to live by that. It didn't challenge 25%. It's going to continue to live by that and all the safety protocols it's imposed, but there isn't a shred of evidence. In fact, the record is the exact opposite, that there's been any problem in the diocese churches, that there's been any spread in the diocese churches, and that the diocese safety measures have succeeded. So therefore, these regulations as applied to the diocese churches are not narrowly tailored at all. They are, as the governor said in his own words, a blunt instrument, a hatchet, not a scalpel. Those are the governor's Mr. Mastro, just so that I have an understanding, do you have a sense of the average difference between 10 people, 10 worshipers, and 25% of all worshipers in these affected zones? In other words, it's 25%. Look, I would just say, based on some personal observations, there are not that many people in churches right now, certainly not as many as prior to the pandemic. So do you have a sense of what 25% represents? Yeah, absolutely, your honor. The diocese churches that are issued here are anywhere from 250 up to about a thousand or more. So you can tell you this, your honor, saying that only 10 people can attend a mass, one of whom is the priest performing the mass, your honor, that's shutting the door. There are literally Catholics trying to go to mass, tried to go this Sunday after the governor's executive order went into effect. And of course my client complied where the door had to be shut to them, because you can't say the first nine come in to a large cathedral and everyone else is turned away and people were crying at the door. I can only say to you this, the 10 person limit is effectively a shutdown, but with social distance, more than six feet apart... For the parish. I'm sorry, your honor? For the parish, not the diocese, right? Yes, your honor. Okay. Yes, for each parish within the shutdown order of each of those churches, and there remain to this day at least 10 churches in red zones of the diocese that could only have admitted 10 people, which is effectively a shutdown order of those churches. And your honor, I just have to say for purposes of the constitutional analysis, this is a purely legal question, whether strict scrutiny applies or not. I think the law in this circuit is quite clear. I mean, you know, most recently the central synagogue case, that it's a strict scrutiny standard when you have a law that singles out houses of worship or religious groups for particular treatment. And here that particular treatment is worse than many other secular businesses that are allowed to operate without capacity restrictions, many other enterprises. And that triggers strict scrutiny. That's a de novo review on the part of this court. Rememberable harm has been found. It's a de novo review on the part of the district. We'll hear from the other side. Thank you very much, your honor. I really appreciate it. Mr. Parker. May it please the court, Josh Parker representing the state. The district court did not abuse its discretion in denying the diocese's motion for a preliminary injunction for two independent reasons. First, the diocese is not clearly or substantially likely to succeed on its sole claim that the executive order's gathering restrictions on houses of worship violate the free exercise clause. The executive order treats religious gatherings alike or better than secular comparators and is subject to rational basis review, which are readily satisfied. And second, it is not in the public interest to enjoin the state from enforcing its data-driven and so far successful measures to curb COVID spread in particular areas with elevated positive COVID test rates before those rates exponentially grow and even more COVID deaths ensue. Starting with the merits, as the district court recognized and as Supreme Court and federal courts across this country have held, laws like executive order 20268 that treat religious gatherings the same as or more favorable than comparable secular gatherings are neutral and generally applicable laws, even if they apply distinct restrictions to religious gatherings. The law in this circuit, contrary to my friend's assertion, is quite clear that what I just stated is the relevant standard. In central rabbinical, this court stated the inquiry that this court has to conduct is whether the law regulates religious conduct. Judge Reagoff Excuse me, this is Judge Reagoff. Do I understand it that in the zones where these restrictions have been put in place, the governor is now allowing schools to fully reopen with testing, even though houses of worship are not? And how can you justify that? Judge Reagoff Your Honor, schools are being permitted to, but only in red and orange zones, and there are currently no orange zones in New York City. So, we're just talking about red zones now. But students and teachers and staff can only attend school if they have a COVID negative test. And the state will provide three rapid, you know, result test kits for schools wishing to participate. In contrast, churches, as the diocese admitted in the trial below, they are not testing their congregants or requiring negative test results. In any case, comparing schools are not a valid secular comparator to houses of worship. As we cite in our brief, there is mounting evidence that we are not seeing super spreader events at primary and secondary schools. And there are other significant restrictions schools are subject to, such as the fact that individual cohorts of students are separated from one another and cannot interact with each other. They're in separate classrooms. This is not like a church or a synagogue where groups of people are gathering together at the same time, leaving at the same time for the express purpose of worshiping together. But getting back to my friend's point on the other side, that merely having different gathering restrictions for houses of worship triggers strict scrutiny, this court has said the opposite. In central rabbinical, this court said you ask whether the law regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interest for purportedly justifying it. The Supreme Court said the same thing in Church of Lukumi. They said to determine whether strict scrutiny applies, you ask whether the ordinances had as their object the suppression of religion or whether they were motivated by government hostility towards religion. Employment Division says the same thing. Governments may not gatherings of houses of worship are treated the same as or more favorable than comparable secular gatherings. Rational basis applies. That is compelled by Chief Justice Roberts' concurrence in South Bay. There, much like here, there is a gathering restriction. Excuse me. This is Judge Park. Could I ask you a question about the capacity limit? The cap of 10 people in red zones for a church that with a normal capacity of over 1,000 people doesn't seem to be connected to any kind of, I don't know, record evidence or science or common sense. I don't even understand how that would pass rational basis review. Can you speak to that? Sure. In regardless of the capacity of a church, if you take a look at our declaration from the director of the Division of Epidemiology, Dr. Blogg, she notes that if you have a gathering, every number up you have from five people in a gathering, whether it's 10 people, whether it's 15 people, whether it's 20 or 25 people, that incrementally increases the risk of a super spreader event. If people are gathering at the same time, leaving at the same time, which they are in the church, which they're singing, my friend on the other side said they don't have singing anymore. That is not true. If you take a look at their declarations, what they've said is the canter and organist still are singing. My question is about why it seems like there's no connection between the size of the facility and the number of people that are allowed to be in that facility. There is for essential businesses, 25 percent or 33 percent. That makes some sense to me. Ten people no matter what the size doesn't. I'm wondering if you can explain that. Your Honor, in mass gatherings, there are similar size restrictions. For example, in orange zones, there's a restriction that only 10 people, whether they're indoor or outdoor, no matter what the size. On the first point, I would say that churches are being treated just as favorably, in fact, more favorably. All indoor gatherings are banned in red zones. Ten people are allowed. That satisfies rational basis. What my point is, if you are indoor, even if you're closed, it makes some sense. Ten people, regardless of size, is there any basis for that number that you can point us to? Yeah. Well, as Judge Matsumoto found in the other case, these restrictions mimic the prior phases of New York Forward. In phase one, indoor gatherings were limited to 10 or fewer people. Phase two or three, 25 or fewer. Phase four, 50 people. Phase one was when the risk is higher. That is the basis. Then I would also point you again to Dr. Blogg's declaration, which says, if you have people singing, if you have people gathering at the same time, part of the risk, I would like to emphasize, is not just when you're indoors having the service. It's when people go outside, where the witnesses for my friend on the other side at the hearing below admitted that typically there is some degree of intermingling outside after the service. If you have 30 people, even if they are spread out within the auditorium, and then they leave intermingled because they know each other, that raises the risk of COVID spread. I'd like to say that the standard of review here is especially differential. As Chief Justice Roberts said in South Bay, restrictions shouldn't be subject to second guessing by the unelected federal judiciary, which lacks the background, competence, and experience to assess public health and is not accountable to the public. As the district court recognized, nearly every court in the state of South Bay is not accountable to the public. Mr. Parker, what I understand, at least you're saying in part, is that ironically, I think this is part of the argument, the 10-person limit was an accommodation to houses of worship. In other words, other similarly situated secular entities are prohibited from having any indoor gatherings in at least the red zone, I take it, maybe also the orange zone. Is that right? Yes, that's exactly right. And that is the inquiry under rational basis, is comparing to comparable secular gatherings. And here, Chief Justice Roberts said in South Bay, justice wrote for the Seventh Circuit in Elam, houses of worship are most comparable to congregant events like lectures, concerts, and theatrical performances, which are prohibited outright in red zones, whereas houses of worship are allowed to have gatherings of at least 10 people. So I'd like to move. Can you answer this question? So Mr. Castro made the not unforceful point that the diocese here has gone out of its way since the pandemic started in the spring to reduce, if not eliminate, the risk of the spread of infection. And that the executive order does not really reflect that effort. What are we to make of that? I have three responses, Your Honor. First, regardless if there was an outbreak in their congregations earlier, there are churches that are in red zones. And let me emphasize, there are 10 in red zones now and there are none in orange zones and none in yellow zones. Before, there were 26. So we're already seeing progress and hopefully there will be fewer in red zones as we proceed. But notwithstanding that, regardless if there was an outbreak earlier, there are elevated rates for the 10 churches that are in red zones now. And that means if you have a 25% capacity, they have churches that have a capacity as many as 1,200. So you could have 300 parishioners inside. There is a high risk that multiple of those parishioners will be COVID positive, possibly asymptomatic, so they can't self-police and not come. And the state is entitled to act prophylactically. There is no need to wait for the next super spreader event in order to regulate. And I'd like to also emphasize, especially under rational basis review, but this would be true even under strict scrutiny, the state is entitled to regulate houses of worship generally. The state is not required to do individualized church-by-church regulation in an emergency. Not only would it be administratively unfeasible, but you could imagine this applying to restaurants too. Some restaurants take more precautions than others should the state have different regulations for each one. This also could potentially raise Fowler-style First Amendment issues if we're treating one religion more favorably than another. And the third point I'd like to make in response to that- Can I ask you briefly something you said? I think I saw somewhere that the executive order is set to expire later this week. Is that right? Or can you just tell us if there's a status update in terms of whether it's going to be renewed or what happens next just to address potential mootness? Your Honor, I believe the governor has authority for a specified period, I believe 30 days, to issue an executive order and then can renew them for another 30 days. And I see no reason why this EO-20268 would not be removed because it's working. We're seeing progress. In the Brooklyn red zone, when it went into effect, the average positivity rate was about 8%. Yesterday, the seven-day average positivity rate was 4.2%. So your understanding is that after the current 30-day period expires later this week, your understanding would be that it'll be renewed for another 30-day period? Is that how this works? That is what I would expect, but I do not know. This is not something that I actually know. So I don't want to make any conversation to the court. You would let us know, presumably. So let me ask you a question and then maybe Mr. Mastro, and I think that this would probably also affect the following council of motion and with Mr. Schick. There's a request for an expedited appeal, regardless of what we do. How fast can the parties complete whatever additional briefing they think needs to be done on the merits? Sounds like you all pretty much know what your arguments are. Yes, although given the 5200 word limit, we would need more time to elaborate. As we said in our 45 days, that would give us enough time to respond. Could you do it in 30 days? I believe we could do 30 as well. And Mr. Mastro, are you on the line? Is Mr. Mastro there? Thank you. I was just unmuted. Thank you, as you can hear us on appeal. So the deadline is whatever you would all set, and we will meet the deadline. This is every Sunday that passes is a crushing blow to Catholics in Brooklyn and Green. All right. So perhaps the better option, and maybe we'll have to wait to hear from Mr. Schick, because I do think that these are in tandem. And it makes sense to me, at least, subject to hearing from my colleagues. But if you all can come up with an appropriate schedule sort of within a 30-day window that we can then approve, then we'll try to do that. If not, let us know by the end of today, and we'll come up with something. We'll devise a schedule. But I think the preference is for the parties to do that, of course, subject to hearing from Mr. Schick in the other council motion. Okay? Is that fair? Yes. Yes, Your Honor. Very much so. I will be pleased to do that. Might I have one minute of rebuttal, please? I'm sorry. Is it possible for me to conclude? Yes, Mr. Schick, go ahead. Thank you. I'd just like to conclude with two brief points. The first in terms of the church is taking additional measures. The district court found that the church does not require parishioners to test negative. There could easily be an asymptomatic carrier. The cantering organist are still singing. The declarations below say nothing about ventilation or open windows. As the amicus brief in support of the state chronicled at page 13 and 14, COVID outbreaks of the virus have resulted from religious gatherings despite physical distancing and other safety precautions. I'd just like to conclude by saying even if this court finds that we don't have a likelihood of success on the merits, it should still deny emergency injunctive relief here because an injunction would not be in the public interest. Plaintiff's interest in indoor, in-person religious gatherings of potentially hundreds of people in the very areas where positive test rates have not outweighed the need to prevent infections. Thank you. Thank you very much. So, Mr. Mastro, I think we have the benefit.